**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------x
ERMOSELE OZEMEBHOYA,         :
                                     :
                 Plaintiff,    :
                                     :
                v.           :   02-CV-10057 (BSJ)
                                     :
EDISON PARKING CORPORATION,   :   **<u>Order</u>**
                                     :
                 Defendant.    :
------------------------------------x
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

      Plaintiff Ermosele Ozemebhoya ("Ozemebhoya") alleges

violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e <u>et</u> <u>seq.</u> ("Title VII"), as well as

29 U.S.C. § 1140, by Defendant Edison Parking Corporation[1]

("Edison").  Specifically, Ozemebhoya claims that Edison

discriminated against him because of his race and national

origin and terminated his employment for the alleged purpose of

depriving Ozemebhoya of benefits under the Employment Retirement

Income Security Act ("ERISA").  Before the Court is the motion

of Edison for summary judgment on all claims, pursuant to Rule

56 of the Federal Rules of Civil Procedure.  For the reasons set

forth below, Edison's motion is GRANTED.

---

[1]    Defendant in its Answer states that it was improperly pled as "Edison
Parking Corporation" and that it should be correctly named as Edison
Properties, L.L.C.

## I. JURISDICTION

This Court has jurisdiction over claims under Title VII and ERISA pursuant to 28 U.S.C. § 1331.

## II. BACKGROUND

### A. Facts

Edison operates public parking facilities in the New York metropolitan area and in Maryland.  Def.'s Local Civ. R. 56.1 Statement ¶ 1.  Ozemebhoya, a black male of African origin and American citizenship, began his employment with Edison in June 1985[2] as a parking attendant.  Id.  ¶ 22.  In 1986, he was promoted to lot manager, id. ¶ 23, and then to general manager in or around 1998, id. ¶ 24.  As general manager, Ozemebhoya supervised twelve to fourteen of Edison's parking lots in Manhattan and Brooklyn.  Id. ¶ 29.  Ozemebhoya held the position of general manager until his termination in the summer of June 2000.[3]  Id. ¶ 24.

### i.   Edison's Operational Safeguards

Because Edison's business involves its employees' handling large amounts of cash, the company has developed various safeguards to reduce the potential for employee dishonesty. See Def.'s Local Civ. R. 56.1 Statement ¶¶ 2-3.  One such safeguard

---

[2]     After Ozemebhoya's fifth year of employment, pursuant to Edison's policy, Edison began matching up to two-percent of Ozemebhoya's employee contributions under a 401(k) plan.  Def.'s Local Civ. R. 56.1 Statement ¶ 28.
[3]     Ozemebhoya was named "Manager of the Quarter" in 1996 and received an award for "Outstanding Dedication" as general manager in 1999.  Ozemebhoya Aff. in Opp. to Mot. for Summ. J. ("Ozemebhoya Aff.") ¶ 3.

is the use of parking tickets that have a specific parking lot number and the address of the lot's location pre-printed on the ticket.  Id. ¶ 3.  These pre-printed tickets are consecutively numbered so that Edison may control and audit each ticket given to customers.  Id. ¶ 10.  Accordingly, Edison employees are instructed to distribute pre-printed tickets in sequential order.  Id. ¶ 4.

"Blank" tickets are also available at Edison's lots.  The "blank" tickets bear Edison's name and, just like pre-printed tickets, are consecutively ordered.  Id. ¶¶ 6, 11.  However, the "blank" tickets do not include the preprinted lot number and location address.  Id. ¶ 6.  Employees are instructed to use "blank" tickets only in the "exceptional and limited" circumstance of pre-printed tickets not being available.[4]  Id. ¶ 5.  Edison states that its limitation on the use of "blank" tickets is intended to detect employee theft as a dishonest employee using "blank" tickets concurrently with pre-printed

---

[4]     According to Edison, Company policy does not permit the use of blank tickets when pre-printed tickets are available, and the supply of pre-printed tickets should be fully exhausted before any blank ticket is used.  Def.'s Local Civ. R. 56.1 Statement ¶¶ 9, 12.  Ozemebhoya claims, however, that Edison has permitted employees to depart from the strict use of pre-printed tickets "provided that proper records and receipts were kept."  Ozemebhoya Aff. ¶ 18.  As an example of an occasion when the contemporaneous use of blank and pre-printed cards was authorized, Ozemebhoya cites a 1999 Indian Festival at Manhattan's South Street Seaport.  Id. ¶ 21.  Ozemebhoya also claims that, due to the unique parking needs of downtown banks concerned about "Y2K" on December 31, 1999, he abandoned the use of parking tickets altogether that evening and received "nothing but praises" from Edison for his actions.  Id. ¶ 20.

tickets could report only the use of, and revenue from, the preprinted tickets.  Id. ¶ 12.

In addition to its ticketing systems, Edison audits transactions at its various lots using "shift reports" and "daily reports."  Id. ¶ 14.  A shift report reflects all transactions during a shift, including tickets given to and redeemed by customers, along with the amount of money received, with notations for any complimentary or voided tickets.  Id. ¶ 15.  The "daily report" compiles the shift reports and reflects totals for the transactions reflected therein.  Id. ¶ 16.  The lot manager for a particular location must ensure such reports are completed and submitted, although this duty may be delegated to an assistant manager or attendant.  Id. ¶¶ 17-18. The person completing the report must sign the report.  The parties do not dispute that it would violate Edison's policy to falsify the identity of the person completing the report or to sign another employee's name on the report.  Id. ¶ 21.

Edison has put additional safeguards in place to monitor its parking lots.  The company employs a system of "Checkers" whereby designated individuals travel to various locations and observe operations on the lot, including ticketing procedures. Id. ¶ 13.  The Checker will prepare a report after visiting a lot and then submit it to Edison's audit department.  Id.

ii.  <u>June 24, 2000</u>

On Saturday, June 24, 2000, Nelson Nieves ("Nieves"), an Edison employee and acting General Manager, visited Edison's parking lot number 237, located at the end of the West Side Highway at Battery Park in Manhattan.  <u>Id.</u> ¶¶ 31, 34.  When Nieves arrived, he observed three other Edison employees at the lot: Willie Leveille ("Leveille"), who Nieves observed in the lot's booth collecting tickets and money; DeLouis Aristilde ("Aristilde"), manager for lot 237, who was observed parking cars; and Ozemebhoya, who Nieves observed "sitting just outside the ticket booth."  <u>Id.</u> ¶ 36.  Ozemebhoya informed Nieves that he was at the lot that day, despite not being scheduled to work, because he had passed the lot on the way to visit the Statute of Liberty with his family and noticed that it was particularly busy and that additional employees were needed to come on duty.[5]  <u>Id.</u> ¶ 37; Ozemebhoya Aff. ¶¶ 12.

The parties agree that when Nieves arrived at the lot, both pre-printed and "blank" parking tickets were being used simultaneously.  Def.'s Local Civ. R. 56.1 Statement ¶ 39; Ozemebhoya Aff. ¶ 13.  Ozemebhoya avers that he had been informed by Leveille, the employee issuing tickets, that

---

[5]     According to Ozemebhoya, upon observing a "surge of patrons" at the lot and only Leveille on duty, he attempted to reach several Edison employees by telephone.  He was able to make contact with Aristilde whom he asked to report to duty at the lot on an "emergency basis."  Ozemebhoya Aff. ¶ 12.

Leveille had accidentally opened and was using a bundle of
"blank" tickets due to "the confusion ensuing from managing the
surge in patronage occasioned by the exceptionally good
weather."  Ozemebhoya Aff. ¶ 13; see also Dep. of Ozemebhoya
(Aug. 5, 2003) at 70-71.  Ozemebhoya claims to have informed
Leveille that he should make a record of the use of all "blank"
tickets and to submit all such tickets to Edison's main office
for audit.  Ozemebhoya Aff. ¶ 13.  After Nieves arrived at the
site and determined that "blank" and pre-printed tickets were
being used simultaneously, he contacted another general manager
who came to the lot and "secured" the tickets, reports and
monies received.  Def.'s Local Civ. R. 56.1 Statement ¶ 42.

      iii. Edison's Investigation

      Edison subsequently commenced an investigation into the
above-described events at Lot 237.  Edison's Vice President of
Security, Joseph Anarumo, a former detective sergeant in the New
York City Police Department, conducted the investigation.  Id. ¶
44.  Ozemebhoya, Aristilde, and Leveille were called to Edison's
main office in Newark, New Jersey on June 26, 2000 and were
questioned.  Id. ¶ 43.  According to Anarumo, and contrary to
Ozemebhoya's account of the events that transpired on June 24,
2000, Leveille claimed that he had not been the one to open the
booklet of "blank" tickets that day but that Ozemebhoya had
directed him to use them.  Aff. of Joseph Anarumo ("Anarumo

Aff.") ¶ 13.  Edison's further review of the shift report
prepared for June 24, 2000 demonstrated that while a bundle of
pre-printed tickets was started that day, it was not exhausted,
with only 50 of approximately 250 available pre-printed tickets
used.  Id. ¶ 16.  The shift report also reflected the use of 75
"blank" tickets that day.  Id.

Deeming the events of June 24, 2000 "suspicious," the
company also reviewed shift reports for additional dates.  Id. ¶
17.  In its review of a shift report for Saturday, June 3, 2000,
another date on which Leveille and Ozemebhoya were at Lot 237,
Edison determined that the number of cars reported to have
parked in the lot was "extremely suspicious" when compared to
other Saturdays in that time period.  Id.  The June 3 report
indicated that 42 cars had parked in the lot on this day which
Edison's research determined to be "warm" and "sunny" and on
which an Edison "Checker" had noted 15 cars had parked by 10:16
a.m.  Id.  Edison compared this day's total to the 142 cars at
the lot on June 24, 2000, and an average of 103 cars at the lot
on each Saturday in June 1999.  Id.  ¶¶ 17, 23.

Edison also noted that the June 3 report identified the
employee who had prepared it as "Willy Leville," which is a
misspelling of Leveille's name.  An outside cryptologist
examined the June 3 report and determined that the handwritten
report had been completed by Ozemebhoya, and that the signature

on the report was fraudulent.[6]  Id. ¶ 19 & Ex. E.  A similar review of a shift report for June 11, 2000 led Edison to conclude that despite bearing Leveille's name and purported signature, the June 11 report was written by Aristilde and that the signature was forged.  Id. ¶¶ 21-22 & Ex. G.

Edison claims that based on the outcome of this investigation, it determined that Ozemebhoya and Aristilde "were engaged in a scheme at Lot 237 to steal money from the Company by using blank tickets concurrently with preprinted tickets, and then by not reporting the blank tickets or the money that was collected from them" and, that for that reason, each was terminated.  Brief of Def. Edison Properties LLC in Supp. of its Mot. for Summ. J. at 11.

Subsequent to Ozemebhoya's termination, Edison presented the results of its investigation to the New York City Police Department.  Def.'s Local Civ. R. 56.1 Statement ¶ 73. Ozemebhoya was arrested and charged with forgery, criminal possession of a forged instrument and falsifying business records.  Id.  The charges were later dismissed.[7]  Edison also

---

[6]    Anarumo avers that Ozemebhoya denied having prepared the June 3, 2000 report.  Anarumo Aff. ¶ 19.  Ozemebhoya concedes that he prepared the report for Leveille, but states that he did not sign it.  Ozemebhoya Aff. ¶ 16. Ozemebhoya submits that it was common for him to prepare shift reports for other employees to be submitted under their signature, particularly those who are non-English speaking, and that Edison management knew of and approved this practice.  Id. ¶¶ 17, 19.

[7]    The parties differ in their representation to the Court as to why the charges were dismissed.  Edison submits that the charges were "dismissed under the speedy trial mandate after the district attorney could not get Mr.

filed suit against Ozemebhoya in New York State Supreme Court in November 2000 demanding an injunction enjoining Ozemebhoya from removing, transferring or assigning his rights under his 401(k) plan with Edison.   Cert. of Keith J. Rosenblatt in Supp. of Def.'s Mot. for Summ. J. Ex. H (Verified Compl.).   The requested relief was denied and Ozemebhoya's 401(k) funds were released to him.   Def.'s Local Civ. R. 56.1 Statement ¶ 79.

## B. Ozemebhoya's Claims

Ozemebhoya argues that Edison's allegations of fraud are merely a pretext for his termination.   Instead, Ozemebhoya submits that he was terminated because of his prior refusal to carry out the directives of Edison management to fire other black employees so that they could be replaced by "Hispanics most of whom were undocumented and could not speak English but were willing to accept wages far less than the black employees were earning."   Compl. ¶ 14.   According to Ozemebhoya, Edison hired a new Executive Vice President in 1999, Paul Ciemelewski ("Ciemelewski"), who sought to make this shift from black to white and/or Hispanic employees in order to revamp the company. Ozemebhoya Aff. ¶ 4.   Ozemebhoya also alleges that Ciemelewski stated a preference for employees with "light skin" and that he

---

Leveille in to testify against [Ozemebhoya]," where Ozemebhoya avers that
"the grand jury voted not indict me for the said or any other charges."
Def.'s Local Civ. R. 56.1 Statement ¶ 73; Ozemebhoya Aff. ¶ 22.

did not "like the way [certain black employees] look."
Ozemebhoya Dep. at 138 (lines 23-25), 139 (lines 1-8). According
to Ozemebhoya, while black employees were terminated for "flimsy
reasons and minor infraction of company rules," such conduct was
tolerated among new Hispanic employees, thereby allowing them to
make gains in the company at the expense of black employees.[8]
Ozemebhoya Aff. ¶ 8.  Ozemebhoya cites Nieves as a Hispanic
Edison employee who he alleges was "caught" stealing by the
company but suffered no adverse employment actions.  Ozemebhoya
Dep. at 95-99.

Ozemebhoya avers that Ciemelewski informed Edison managers
that it was the policy of the company that its black employees
should learn Spanish in order to communicate with new Hispanic
employees.  Ozemebhoya Aff. ¶ 5.  Ozemebhoya claims that after
he spoke up at a meeting in protest of this "policy,"
Ciemelewski targeted him and sought to implicate him in
wrongdoing, including offering cash and other incentives to
employees who would volunteer damaging information about him.
Id. ¶ 6.

Ozemebhoya further alleges that Edison's decision to
terminate him was motivated by its desire to deprive him of his

---

[8]     The Court notes that Plaintiff is somewhat inconsistent in his
allegations here, as he argues on the one hand that Edison was motivated to
save money by hiring Hispanic workers at lower wages without vested benefits,
but also argues that "incoming Spanish speaking White Hispanics experienced a
meteoric rise in their careers" with Nieves' salary of $38,000 compared to a
$24,000 salary for his "black counterparts."  Ozemebhoya Aff. ¶ 7.

401(k) benefits.  Compl. ¶ 10.  According to Ozemebhoya, Edison terminated him and other black employees "to further their policy of replacing senior employees with younger and inexperienced ones so that the company can save money from not having to make matching contributions towards our 401K pension plan."  Ozemebhoya Aff. ¶¶  24-25.

### III. THE STANDARD FOR SUMMARY JUDGMENT

A party moving for summary judgment under Federal Rule of Civil Procedure 56(c) must show that no genuine issues of material fact remain to be tried and that it therefore is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In order to defeat a motion for summary judgment, the non-moving party must adduce admissible evidence that demonstrates that genuine issues of material fact remain.  See G.D. Searle & Co. v. Medicore Commc'ns, Inc., 843 F.Supp. 895, 903 (S.D.N.Y. 1994).  In deciding the motion, the district court "is not to resolve issues of fact but only to determine whether there is a genuine triable issue as to a material fact."  Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000).  The court must consider the evidence and draw all reasonable inferences in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment is improper if,

looking at the record in this light, there is any evidence from any source from which a reasonable inference could be drawn in favor of the non-moving party.  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  However, a party opposing summary judgment "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that [its] version of relevant events is not fanciful."  Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (internal citations and quotation marks omitted).

Furthermore, in the context of a case where discrimination is alleged, a trial court must proceed particularly cautiously in evaluating the motion for summary judgment by an employer because direct evidence of the intent to discriminate is rarely found.  See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Plaintiff's *Prima Facie* Case

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court set out the analytical framework a district court must use in evaluating a Title VII claim at the summary judgment stage.[9]  Under the McDonnell Douglas framework, the plaintiff has the initial burden of making out a prima facie

---

[9]     Ozemebhoya grounds his employment discrimination claims in Title VII, and in 42 U.S.C. § 1981.  Courts analyze employment discrimination claims under Title VII and those under section 1981 identically.  See Choudhury v. Polytechnic Inst. of N.Y., 735 F.2d 38, 44 (2d Cir. 1984).

case of discrimination or retaliation.  See id. at 802.  The
prima facie case of discrimination is accomplished by showing
(1) membership in a protected class; (2) satisfactory job
performance; (3) termination from employment or other adverse
employment action; and (4) either the ultimate filling of the
position with an individual who is not a member of the protected
class, or other circumstances giving rise to an inference of
discrimination.  Farias v. Instructional Sys., Inc., 259 F.3d
91, 98 (2d Cir. 2001); see also James v. N.Y. Racing Ass'n, 233
F.3d 149, 153-54 (2d Cir. 2000).

      As the Second Circuit noted in James, when the "minimal"
prima facie case is made, a plaintiff "creates a presumption
that the employer unlawfully discriminated, and thus places the
burden of production on the employer to proffer a
nondiscriminatory reason for its action."  James, 233 F.3d at
154 (internal citations and quotation marks omitted).  If the
defendant fails to present a nondiscriminatory reason for its
actions, the plaintiff may prevail as a matter of law.  See id.;
see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,
254 (1981).  If the defendant meets this intermediary burden,
the plaintiff must then prove by a preponderance of the evidence
that the defendant's purported non-discriminatory reason was a
"pretext" and not the true basis for its action.  See id. at
253.  Pretext can be established only if "it is shown both that

                              13

the reason was false, and that discrimination was the real reason." Gallo, 22 F.3d at 1225 (citing St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502 (1993)).

On Edison's motion for summary judgment, this Court must consider all the evidence and draw all reasonable inferences in favor of Ozemebhoya.  The Court is also mindful that, in determining the appropriateness of summary judgment, the record must be considered as a whole and not "in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence." Howley, 217 F.3d at 151.

If Ozemebhoya's case is looked at in the most favorable light, he has met his initial minimal burden.  He alleges that he was terminated as part of an attempt by Edison to replace black employees with white and/or Hispanic employees. Ozemebhoya stated in his deposition that, prior to his own termination, he was instructed to fire black employees by a Vice President who stated that he did not "like the way they look" and who indicated that customers prefer employees with "light skin."  Ozemebhoya also alleges that black employees faced more serious consequences for infractions of Edison policies when compared to white or Hispanic employees.  Thus, plaintiff has established the minimal requirements for a prima facie case of discrimination.

14

**B. The Employer's Response**

Under Title VII case law, a plaintiff who establishes a prima facie case thereby raises a presumption of discrimination, and the burden[10] then shifts to the employer to rebut that presumption by offering a "legitimate, nondiscriminatory reason" for its actions.  See James, 233 F.3d at 154.  Edison presents admissible evidence that it terminated Ozemebhoya based on its good faith belief that Ozemebhoya violated company policy by (1) falsifying the June 3, 2000 shift report, (2) participating in the issuance of "blank" parking tickets at Lot 237 on June 24, 2000 when pre-printed tickets were available, and (3) being involved in a scheme to defraud Edison.  Edison described its investigation in detail, which was conducted by its Vice President for Security.  Edison established that it interviewed several employees regarding the use of "blank" tickets on June 24, 2000 and that Ozemebhoya's version of the facts was directly contradicted by the employee he had identified as having opened the packet of "blank" tickets.  The company consulted an outside handwriting expert who identified plaintiff as the individual who had written out the shift report on which another employee's name was listed as the author.  And Edison further reviewed its

---

[10]    "This burden is one of production, not persuasion; it can involve no credibility assessment."  Reeves v. Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal quotations and citations omitted).

records to confirm that an unusually low number of tickets and receipts had been remitted for Lot 237 on other dates in June 2000 when Ozemebhoya was known to be on site.

Based on the evidence it submitted, Edison has made a sufficient showing that it reasonably determined that the improper use of "blank" tickets on June 24, 2000, combined with questions surrounding submission of the June 3 shift report and suspicions regarding the number of cars reported on June 3, all indicated a scheme involving Ozemebhoya to defraud the company. Accordingly, the Court finds that Edison has met its burden of establishing a legitimate, non-discriminatory reason for plaintiff's termination.

**C. Effect of the Rebuttal of the Presumption of Discrimination**

If the employer is able to articulate a non-discriminatory reason for its actions, the presumption of discrimination "simply drops out of the picture." St. Mary's, 509 U.S. at 511. The employer will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding that the employer's proffered reasons are a pretext for prohibited discrimination. See id.; Burdine, 450 U.S. at 255-56. However, a plaintiff cannot demonstrate that the reason is pretextual "unless it is shown both that the reason was false, and that discrimination was the real reason." Gallo, 22 F.3d at 1225 (citations and internal quotations omitted).

The Court is cognizant of the fact that where an employer's discriminatory intent is at issue, a trial court should proceed with caution in determining that summary judgment is appropriate.  See Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996).  However, in the present case, Ozemebhoya has failed to submit admissible evidence from which a jury could find that Edison's stated legitimate, nondiscriminatory reason for plaintiff's termination is not credible.  See Gallo, 22 F.3d at 1225.  Furthermore, the Court finds that plaintiff has not submitted direct, statistical or circumstantial evidence from which a trier of fact could find that a discriminatory reason is more likely to have motivated Edison's decision.  See id.  While we must resolve all ambiguities and draw all inferences in the non-moving party's favor, summary judgment is appropriate where, as here, "little or no evidence may be found in support of the non-moving party's case."  Celotex, 477 U.S. at 325.

   i.   Credibility of the Non-Discriminatory Explanation

In order to determine that Ozemebhoya raises no issue of material fact challenging the credibility of Edison's stated reasons for his termination, the Court need not revisit whether Ozemebhoya did, in fact, violate Edison's policies, as plaintiff has invited the Court to do.  Instead, the Court must only determine Edison reasonably believed that he had violated company policies when he was terminated.  An employer may

17

sustain its employment decision without showing that the information on which it relied in its investigation was correct, but only that it reasonably relied on such information.  See Graham v. Long Island R.R., 230 F.3d 34, 44 (2d Cir. 2000); see also Roge v. NYP Holdings, Inc., 257 F.3d 164, 169 (2d Cir. 2001) (finding summary judgment appropriate where, "at the time of [plaintiff's] termination, the [employer] believed . . . that [plaintiff] had committed . . . fraud").  The Court finds that based on its submissions, Edison has established that it conducted a credible and impartial investigation and that it reasonably relied on these findings when it determined that Ozemebhoya should be terminated.

Ozemebhoya alleges that Edison employees have offered "inconsistent" versions of the reason for his termination. However, contrary to the picture Ozemebhoya draws based on selective excerpts from depositions of Edison employees, the record as a whole demonstrates a consistent description of the investigation Edison conducted and no contradictions in the discussion of its findings and conclusions.  Furthermore, no evidence in the record suggests improper interference by any Edison employee in the investigation.[11]  See Graham, 230 F.3d at

---

[11]   Notably, Plaintiff does not allege any involvement in the investigation by Ciemelewski, the Edison Vice President to whom he attributes racially discriminatory statements and actions.  For his part, Ciemelewski avers that he was not involved in the decision to terminate Ozemebhoya.  Ciemelewski Aff. ¶ 2.

44. With no evidence presented that could lead a reasonable
jury to determine that Edison's investigation was not credible,
and with no proof offered to show that the company was
unreasonable in relying on the results of its investigation in
deciding to terminate him, Ozemebhoya cannot sustain a claim
that the reason given by Edison for his firing was false.

    ii. <u>No Showing that Discrimination Motivated Termination</u>

    Because Ozemebhoya fails to present evidence sufficient to
show that Edison's non-discriminatory reason is not credible,
the Court need not determine if he has presented evidence from
which a jury could determine that discrimination was in fact the
real reason for his termination.  Nevertheless, the Court will
examine Plaintiff's contentions on this point.

    Ozemebhoya alleges that he and other black employees were
fired for no reason, or for only "flimsy" reasons, in order to
replace them with Hispanic employees.  If a plaintiff can show
that "similarly situated" employees of another racial group
received more favorable treatment by an employer, this can
"serve as evidence that the employer's proffered legitimate,
non-discriminatory reason for the adverse job action was a
pretext for racial discrimination." <u>Graham</u>, 230 F.3d at 43.
However, in the present case, Ozemebhoya does not support his
allegations of disparate treatment with statistics or admissible
evidence that could show that he was treated differently than

another similarly situated individual.  See Fierro v. Saks Fifth
Ave., 13 F. Supp. 2d 481, 490 (S.D.N.Y. 1998).  Ozemebhoya's
deposition testimony and other submissions name Nieves—and only
Nieves—as a Hispanic employee who is alleged to have received
more favorable treatment from Edison.  According to Ozemebhoya's
testimony, Edison did not terminate Nieves despite having caught
him stealing money.  Yet, the factual record does not support a
claim that Edison had ever determined that Nieves stole or that
any findings were made by the company that were in any way
similar to those made with respect to the Plaintiff.[12]  Thus,
without proof of similarly situated employees of other racial
groups being favored, Ozemebhoya fails to establish a basis on
which a jury could conclude that he was fired for any reason
other than Edison's reasonable belief that Ozemebhoya violated
its policies as part of a scheme to defraud the company.

**D.   Plaintiff's ERISA Claim**

     With regard to Plaintiff's ERISA claim, there is also no
admissible evidence from which a reasonable jury could conclude
that defendant terminated plaintiff's employment with the intent

---

[12]     Even if Ozemebhoya had supported the allegation that Nieves was found
to have stolen with sufficient proof, his own testimony undermines his theory
that the facts of Nieves' employment show that Hispanic employees were
favored by Edison.  When deposed, Ozemebhoya testified that Nieves was a
"political" hire who received special treatment based not on his race or
national origin, but on his relationship to an unnamed individual responsible
for giving Edison a city contract related to the South Street Seaport.
Ozemebhoya Dep. at 104-105, 148-49.  Thus, Ozemebhoya has not offered
sufficient proof that Nieves' treatment is indicative of favored treatment
given to Hispanics by the company.

to reduce his pension benefits.  See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997).  As discussed above, no basis has been established from which a jury could conclude that he was fired for any reason other than Edison's good faith belief that Ozemebhoya violated company policy and had attempted to defraud the company.  Because the loss of Ozemebhoya's pension benefits was a "mere consequence" of his termination by Edison, Edison is entitled to summary judgment on the claims under section 510 of ERISA, 29 U.S.C. § 1140.  Id.

## V. CONCLUSION

For the reasons set forth above, the motion by Edison for summary judgment is GRANTED.  The Clerk of the Court is directed to enter judgment on Defendant's behalf and to close this case.

**SO ORDERED:**

Barbara S. Jones
**UNITED STATES DISTRICT JUDGE**

New York, New York
September 7, 2007

21